UNITED STATES of America,
Plaintiff–Appellee,

v.

Yaphet K. JAMAL, Defendant–Appellant.

No. 95–3847.

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1996.

Decided July 1, 1996.

Barry Rand Elden, Chief of Appeals, John Gallo (argued), Office of the U.S. Atty., Chicago, IL, for Plaintiff–Appellee.

Standish E. Willis (argued), Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, RIPPLE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

A New Year's Eve squabble with one's girl friend seldom leads to the sort of consequence visited on Yaphet Jamal. But for

Jamal, the result of such a spat, indirectly at least, is 10 years in a federal correctional institution for robbing banks. We now consider his appeal.

In December of 1994 Jamal was unemployed and living with his girl friend, Marie Fullwiley, at her home on Pine Street in Waukegan, Illinois. The couple had a tiff on New Year's Eve, and either he left or Fullwiley tossed him out. The relationship was kaput. But Jamal's stuff (clothing, etc.) was still in the house and, understandably, he wanted it back.

Apparently sensing that returning to Fullwiley's house for his things on New Year's Day would be unwise—she obviously was pretty ticked off—Jamal sought help (and protection) from the Waukegan police department. He walked to the police station where he explained he wanted his belongings but feared a confrontation. At Jamal's request, Waukegan Police Officer Stephen Gonyo drove with him, in a squad car, to Fullwiley's house on Pine Street. During the drive, Jamal and Gonyo reached an understanding that it would be best to let the officer "do the talking" with Fullwiley.

When they arrived at Fullwiley's house, Gonyo said he was there "to pick up Mr. Jamal's duffel bags." Fullwiley, apparently not conversant with Emily Post, said, "No way is that motherfucker going to cross my threshold. . . ." A few minutes later, Fullwiley played the queen of hearts, asking Jamal, in front of Gonyo, "Why don't you tell the officer about the robbery you committed, you son of a bitch?" She added, a moment later, that the robbery was committed in Waukegan a few weeks earlier, on December 16.

This information triggered a chain of events that resulted in Jamal going to trial on an indictment alleging three bank robberies. The banks were First Midwest of Zion, Illinois (hit on November 15, 1993), First Midwest of Waukegan (struck on January 25, 1994), and the Waukegan branch of the Bank of Northern Illinois (victimized on December 15, 1994). A jury found Jamal guilty on all three charges, and he's now serving a 10–year sentence.

On this appeal Jamal raises three issues: (1) whether the district court erred in not suppressing his identification as the robber of each of the banks; (2) whether it was error to try the robberies together; and (3) whether the evidence was sufficient to support the conviction. Finding less than a scintilla of merit to these claims, we affirm.

■ Ordinarily, and usually justifiably, defendants prefer to go to trial on as few charges as possible. Prosecutors usually prefer an opposite course—the more the merrier generally being their preference. These conflicting desires often lead to routine hassles over joinder of charges, governed by Rule 8(a) of the Federal Rules of Criminal Procedure, and relief from what is alleged to be prejudicial joinder, a process governed by Rule 14. Jamal's motion for severance was denied and, because two decisions are actually involved, we employ two standards of review. We review de novo the issue of whether joinder of offenses charged in the same indictment is permissible under Rule 8(a). We review a severance denial under Rule 14 for an abuse of discretion.

■ Because the three charges in the indictment are identical—robbery in violation of 18 U.S.C. § 2113(a)—the joinder issue under Rule 8(a) comes to a screeching halt. As we tried to make clear in *United States v. Coleman*, 22 F.3d 126 (7th Cir.1994), where four separate weapons offenses 21 months apart were joined, the fact that the charges are the same is a sufficient basis for uniting them under the rule. The real action in our case, actually in any case where joined offenses are the same, is under Rule 14. And under Rule 14 Jamal has not successfully identified any prejudice caused by the joint trial of the three robberies.

We fail to see any likelihood that the jury was confused concerning the separate charges, especially considering that the trial was short (a total of four days, with only two involving the presentation of evidence) and the evidence was not complex. *See United States v. Donaldson*, 978 F.2d 381, 392 (7th Cir.1992); *United States v. L'Allier*, 838 F.2d 234, 241 (7th Cir.1988). Also, the government presented the evidence relating to each robbery separately, thereby further reducing

the likelihood of any jury confusion. Finally, the district court specifically instructed the jury to consider the evidence relating to each count separately and to render separate verdicts on each count, and "our theory of trial relies upon the ability of a jury to follow instructions." *United States v. Percival,* 756 F.2d 600, 610 (7th Cir.1985).

▇ Jamal also argues that the evidence was insufficient to support his conviction on any of the charges. This is a peculiar argument considering the eyewitness testimony of seven bank employees, each of whom identified Jamal as the robber either in open court during the trial or from a photo spread shown to them prior to their trial testimony. It also ignores the testimony of Ms. Fullwiley, who drove several nails into Jamal's coffin when she told the jury that Jamal was the person depicted by bank video cameras in the first two robberies and that he told her about the third and even gave her a little of the loot to boot. The evidence of Jamal's guilt, we find, was overwhelming.

▇ We now arrive at the last issue, Jamal's claim that the district court erred when it declined to suppress the identification evidence. This issue brings us back to Ms. Fullwiley, Jamal, and Officer Gonyo, who were at the home on Pine Street when we left them.

Quite understandably, Fullwiley's claim that Jamal committed a robbery on December 16 got Officer Gonyo's attention. Given this claim, he probably would have been cited for dereliction of duty had he done nothing. And what he did was, we think, absolutely appropriate under the circumstances.

Jamal had walked to the police station to request help in getting his belongings (and perhaps himself) safely out of Fullwiley's house. Jamal voluntarily rode to the home on Pine Street in Officer Gonyo's squad car. He was happy to have the long arm of the law in his corner for the expected confrontation with the angry Fullwiley. Once Fullwiley made her accusation, Gonyo decided it would be a good idea to take Jamal back with him to the police station to see whether any bank robberies were reported as having been committed on December 16. Jamal agreed

to go, saying "I have no problem. I didn't do anything wrong. I got nothing to worry about." Jamal, of course, was not under anything even remotely close to a formal arrest.

On the way to the police station, Gonyo called his sergeant over the radio and asked to meet him at a Mobil gas station about a minute away from Fullwiley's house. At the gas station, Gonyo told the sergeant what Fullwiley had said, and the sergeant responded that he was not aware of any robberies occurring on December 16. Now, we acknowledge there may be a slight inconsistency between Gonyo's and the sergeant's recollection of this short chat, but it is of no moment at this time. When Gonyo returned to the car, he told Jamal that he was going to check the police station computer for any December 16 robberies.

The drive to the police station took less than a minute. Officer Gonyo parked the squad in the parking area adjacent to the building, not in the sally port, the secure area where officers park when they bring in arrestees. Gonyo and Jamal walked together through the front door of the station and to the public waiting area, where Jamal sat in a chair for about 10 minutes while Gonyo conducted a computer search of police files. Officer Gonyo believed Jamal was free to leave at any time, never was told not to leave, was not put in handcuffs, and did not have anyone sit with him to make sure he stayed.

Officer Gonyo checked the computer for robberies occurring between 6 p.m. on December 15, 1994, and 6 a.m. on December 17, 1994, and found only a home invasion, for which the offender's description did not match Jamal. That the check came up dry is understandable for the third bank robbery committed by Jamal actually occurred prior to 6 p.m. on December 15. Gonyo then told Jamal about the home invasion and the offender description which did not match. The officer told Jamal that because he had been arrested before, he wanted to enter him in the "compucenter," a computer photo device in the police booking room. Jamal said "Okay." Jamal did not say anything or gesture in any way that he did not want his

**916**

picture taken. Gonyo did not in any way suggest that he had to do this.

The two went to the booking room, where Gonyo took the photograph and entered certain biographical data (height, weight, etc.) into the computer. The whole process took about five minutes. Gonyo then asked Jamal if he wanted a ride home, Jamal said yes, and he and Gonyo started for the door. Jamal then said he would walk home, and the two parted company. The total time the two were together, from leaving Fullwiley's house to the split-up at the station, was about 20 minutes.

A subsequent police investigation—with Jamal's New Year's Day computer picture as part of a photo spread shown to witnesses—resulted in the identification of Jamal as the robber of the banks. He was arrested on January 4.

Jamal sought to suppress the identification, claiming his photo was taken against his will during an "unlawful custodial detention in violation of the Fourth Amendment." The district court denied the motion and the jury got to hear the evidence at trial.

The motion to suppress, we conclude, was properly denied. It is perfectly clear that Jamal was never under arrest or "in custody" as that term is commonly used in suppression parlance. He voluntarily stayed with Gonyo, whose help he initially sought out. This unique situation, in our view, does not even rise to the level of "intrusion" permitted under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). For that reason, we need not discuss the "sliding evidentiary scale" referred to in *United States v. Chaidez*, 919 F.2d 1193 (7th Cir.1990). Furthermore, if by some twisted logic the taking of the photograph were viewed as improper, its use here was harmless for Jamal's picture could easily have been obtained in a lawful fashion, such as through the service of a grand jury subpoena.

AFFIRMED.