**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Marshall ARRINGTON, Jr.,**
**Defendant–Appellant.**

No. 98–1910.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 2, 1998.

Decided Oct. 30, 1998.

Paul Garcia, Gil M. Soffer (argued), Office of the United States Attorney, Chicago, IL, for Plaintiff–Appellee.

Daniel G. Martin (argued), Office of the Federal Defender Program, Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and CUMMINGS and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Robberies were committed at seven Bank of America branch offices located in different Jewel food stores around south suburban Chicago over a four-month period in late 1996 and early 1997. During the first three, the robber displayed an object that appeared to be a gun. In the last four, an actual handgun was displayed. Some $62,000 was taken in the robberies, which drew considerable attention as the FBI and police departments from Joliet, Bolingbrook, Clarendon Hills, Woodridge, Wheaton, Lisle, Oak Lawn, Naperville, Lemont, and Downers Grove searched for the culprit. Eventually the FBI settled on Marshall Arrington as the bandit, and he was indicted on seven robbery counts and four counts of using a firearm during a crime of violence under 18 U.S.C. § 924(c).

A jury found him guilty on all counts. Today we consider, but reject, his appeal.

Excellent police work led to Arrington's arrest. The fourth robbery took place around 8:30 in the morning on January 3, 1997, at the Bank of America branch inside a Jewel food store in Oak Lawn, Illinois. FBI agents interviewed a teacher at a nearby kindergarten shortly after the robbery, and she told them she observed a new, black Blazer (or Jimmy) backed into a parking space in the parking lot near the bank when she arrived there a little before 7:00 in the morning. She noticed that the vehicle had no front license plate and that it was gone shortly after the robbery.

A month later, another robbery occurred in Wheaton. A maintenance man employed by the shopping mall where the Bank of America was located spotted a man running toward a black Blazer that was backed into a parking space at the mall. The Blazer took off, and the man was able to recall for the FBI that its rear license plate bore three letters, and two of them were L and S. The man also reported that a spare tire was mounted on the rear of the Blazer. Two weeks later, a Downers Grove police officer observed a black Blazer bearing license number LDS–976. The Blazer had a rear-mounted spare tire and no front license plate. The officer, on routine patrol duty, stopped the car and approached the driver, who identified himself as Marshall Arrington with an address of 11A Kingery Quarter in Hinsdale, Illinois. The officer later advised FBI agents of this encounter and the fact that Arrington appeared to fit the description in various police reports of the Bank of America robber.

Federal agents and local police then took up surveillance positions at Arrington's residence. During the morning of March 20 they followed Arrington from his home but lost him as he was driving his Blazer either on or near the Eisenhower Expressway. Three hours later a robbery was pulled at the Bank of America branch office in a Jewel food store in West Dundee.

News of the West Dundee robbery was relayed to the surveillance team tracking Arrington. The agents then waited in front of Arrington's residence in Hinsdale, and he arrived there an hour later. The agents pulled near his black Blazer and activated their police lights. Agent Francis Marrocco of the FBI ordered Arrington to show his hands, which he did, but he then pushed himself away from the steering wheel and started running from the Blazer. Arrington was apprehended and cuffed, and a search revealed two guns: a Smith & Wesson semi-automatic pistol inside a nylon holster tucked in the small of his back and a .38 derringer in his front pocket. Both were fully loaded, with hollow-point bullets in the Smith & Wesson. Arrington was also carrying more than $2,000 in cash.

Later, back at a police station, Arrington confessed to all seven robberies and consented to searches of his Blazer and residence. The searches turned up tons of incriminating evidence, including marked money from the West Dundee robbery, and all sorts of receipts for expensive cash purchases made close in time to robberies committed during the preceding several months.

■ Arrington's appeal is a weak one, for his primary issue concerns his consolidated trial on all seven bank robbery charges (and, of course, the related § 924(c) counts on the last four). In *United States v. Jamal*, 87 F.3d 913 (7th Cir.1996), we wrote:

> Ordinarily, and usually justifiably, defendants prefer to go to trial on as few charges as possible. Prosecutors usually prefer an opposite course—the more the merrier generally being their preference. These conflicting desires often lead to routine hassles over joinder of charges, governed by Rule 8(a) of the Federal Rules of Criminal Procedure, and relief from what is alleged to be prejudicial joinder, a process governed by Rule 14.

At 914.

In *Jamal*, for several reasons, we concluded that it was not error to try the defendant on three bank robberies at the same time. This case, although it involves more robberies, is an even stronger case for a joint trial than the situation we sanctioned in *Jamal*.

Arrington's argument really boils down to a preference. He would prefer to have separate trials on each charge. That's understandable. Perhaps, after a conviction or two, the government would decide that enough is enough and forego additional trials on the robberies that had not yet moved to the front of the queue. That would be ideal because formal convictions, especially on multiple § 924(c) counts which rachet up the penalties, could be avoided. But a defendant's preference is not a major concern when district judges consider joinder/severance issues because one trial, rather than several, is the rule, not the exception.

Here it is clear that had Arrington gone to trial on only one robbery at a time, much of the evidence about the other bank jobs would have been admissible to prove his identity as the robber under Rule 404(b) of the Federal Rules of Evidence. The similarities between the seven robberies overwhelm the few differences (and there are always differences, to be sure) between them. The robberies here were all part of the same scheme to rid the banks of their deposits without filling out withdrawal slips. Separate trials were not required by law or compelled by common sense.

■ Arrington also takes a stab at the instructions given to the jury on the charges. He asked the judge to give Seventh Circuit pattern jury instruction 7.03, which reads:

Each count of the indictment charges the defendant with having committed a separate offense.

Each count and the evidence relating to it should be considered separately, and a separate verdict should be returned as to each count. Your verdict of guilty or not guilty of an offense charged in one count should not control your decision as to any other count.

The judge, however, gave a modified version of 7.03, inserting this line before the final sentence:

The evidence relating to one count, however, may also relate to another count.

In what should surely draw a penalty flag for overstatement, Arrington argues that this minor modification of instruction 7.03 "perverted" its purpose. We fail to see why. The fact of the matter is that the additional language is an accurate statement of law. Because there was evidence in this case that related to several counts at the same time, modifying the standard instruction, which was not unprecedented, was not error. *See United States v. Pulido,* 69 F.3d 192, 208 (7th Cir.1995).

Arrington also challenges several pretrial rulings that denied motions to quash his arrest and suppress (1) his statements, (2) the physical evidence secured during the searches, and (3) identifications of him as the robber by several witnesses.

■ Arrington states that during the government's surveillance, which lasted about a month, the agents only should have formed the impression that he was "a law-abiding family man engaged in the day-to-day activities of life."[1] Perhaps true. But when the FBI surveillance team "lost" him on March 20 and then learned that another Bank of America in a Jewel food store was hit during the short time he was out of sight, their antenna must have shot up through the roof of their cruiser. They then, quite naturally, went to Arrington's home and waited for his return. At that time they at least had enough evidence to warrant a *Terry* stop. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). When Arrington bolted, was stopped, and guns were found on his person, the agents had probable cause—in spades—for an arrest.

■ Arrington's challenge to the admissibility of his confession is without merit. Arrington admitted committing the robberies during a one-hour interrogation that began a half an hour after his arrest. At a hearing on the motion to suppress, an FBI agent (Beth Mullarkey) gave testimony which, if believed, established that Arrington's confes-

---

**1.** That "impression" sounds rather silly considering that the agents also had a strong hunch that he was the Jewel/Bank of America stickup man, and they knew he had prior convictions for armed robbery, rape, two burglaries, criminal damage to property, and attempted deviant sexual assault.

sion (and the consent he gave to searches) was voluntary. We need not get into the details of that testimony because it was believed by the district judge. To tamper with that credibility determination on appeal would not be proper.

■ We also can find no merit to the claim that the district judge erred in denying Arrington's motion to suppress identifications of him as the robber (by three bank tellers) on the ground that they were the product of impermissibly suggestive lineups. That the lineups were not unduly suggestive is best exemplified by the fact that two tellers identified someone other than Arrington as the robber. All Arrington really points to here are minor differences between his appearance—he says, for example, that his moustache was "more pronounced" than those of other lineup participants. But differences of this sort are not objectionable. A lineup of clones is not required. We easily find that the district judge did not clearly err in concluding that the facts did not support a finding of improper suggestiveness.

■ Finally, Arrington attacks his sentence, which admittedly was harsh, as a violation of the Eighth Amendment. But his sentence, 83 years, was based on a proper application of the federal sentencing guidelines (18 years) on the robbery counts and the imposition of mandated consecutive terms (of 5–20–20–20 years) on the four § 924(c) counts.

Arrington's counsel does a splendid job arguing why the sentence imposed here is unfair as compared to similarly situated defendants convicted in state courts. But Congress has mandated harsh penalties, particularly for defendants like Arrington who repeatedly use guns to commit serious crimes. As we have noted, "[t]he cruel and unusual punishments clause of the eighth amendment permits life imprisonment for a single drug crime .... Life for a repeat bank robber whose record includes murder and attempted murder is an easy case." *United States v. Washington*, 109 F.3d 335, 338 (7th Cir.1997). The same can be said about Mr. Arrington, a repeat bank robber whose criminal record reflects a life of violent crime interrupted only by terms of im-

prisonment. Given the limited nature of Eighth Amendment proportionality review, and precedents upholding life sentences for persons who have committed lesser crimes, *United States v. Farmer*, 73 F.3d 836 (8th Cir.1996) (rejecting Eighth Amendment challenge to a mandatory life sentence where defendant participated in attempted armed robbery of a convenience store); *United States v. Dittrich*, 100 F.3d 84, 87 (8th Cir.1996) (rejecting Eighth Amendment challenge to a life sentence where defendant was convicted of armed robbery of a post office and previously was convicted of assault with intent to commit bodily injury and voluntary manslaughter), it is clear that the Eighth Amendment does not prohibit the imposition of the heavy 65–year consecutive terms that § 924(c) requires. Arrington's effort to avoid the sentence Congress has mandated must be rejected.

For all these reasons, the judgment of the district court is affirmed.