# DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FOURTH DISTRICT

**MARQUIS VALENTINE,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-1448

[November 12, 2020]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Daliah H. Weiss, Judge; L.T. Case No. 502016CF007648A.

Carey Haughwout, Public Defender, and Erika Follmer, Assistant Public Defender, West Palm Beach, for appellant, and Seth Miller, Innocence Project of Florida, Inc., Tallahassee, and Alexis Agathocleous, Innocence Project, Inc., New York, New York, for Amici Curiae Innocence Project of Florida, Inc.

Ashley Moody, Attorney General, Tallahassee, and Luke R. Napodano, Assistant Attorney General, West Palm Beach, for appellee.

### *On Motion for Rehearing and Certification*

MAY, J.

We deny the defendant's motion for rehearing and for certification but withdraw our previously issued opinion and substitute this in its place.

The defendant appeals his conviction and sentence for first-degree murder. He raises multiple issues involving his motion to suppress, his request for special jury instructions on eyewitness and expert witness testimony, and evidentiary rulings on the admission of a third-party identification, eyewitness statement, and a prior consistent statement, among others. While we agree that error occurred, we determine that error to have been harmless and affirm.

- ***The Murder***

The victim and his best friend went out for drinks. They then went to a convenience store to pick up beer and lottery tickets.

A manager and two employees were working at the store. The manager was behind the counter, one employee was stocking merchandise, and the other was outside. The manager saw the victim and his friend get in line to purchase lottery tickets. They appeared to be drunk or high and were loud and rude, cursing at each other and the manager.

The manager then saw the defendant and his girlfriend enter the store.[1] The manager had seen them together in the store on other occasions. They went to the drink cooler where the defendant opened the cooler door. They then got in line behind the victim and his friend.

What happened next is in conflict. Suffice it to say that the victim and the defendant had a verbal exchange. One version has the victim initiating the conversation; in the other, the defendant initiated the exchange. Both versions, however, end with the defendant indicating he will see the defendant outside. The defendant left the store, followed by the victim and his friend. The victim's friend was walking to the passenger side of the car when he saw the victim put his beer down and hands up. The defendant then shot the victim and ran off.

The manager heard a shot outside the store but did not see the shooting because he was helping another customer. He looked at the surveillance screen and saw the defendant running away.

Deputies responded to the scene. One of them saw the unresponsive victim sitting in the driver's seat while a store employee and the victim's friend tried to help him. The victim's friend was hysterical, yelling "please don't let him die. I can't believe they shot him. They know who—they know him." Two deputies removed the victim from the vehicle to render CPR.

When the paramedics arrived, the first deputy spoke with the manager and victim's friend. The manager told him the defendant was wearing a dark t-shirt, light pants, gold teeth, a gold necklace, and a dark hat. The victim's friend described the defendant as a black male wearing a black-colored shirt, light colored shorts, a black hat, and black shoes. A BOLO issued.

---

[1] The precise relationship between two is unclear, but she is referred to as the girlfriend for ease of reference.

Detective R. arrived. He obtained a copy of the surveillance video. After viewing it, he recognized the defendant's girlfriend from a prior investigation. She lived a few houses away.

After some additional research, law enforcement developed a suspect. Detective P. created a photo lineup. Detective R. administered the photo lineup to the manager inside his vehicle while parked at the store. The manager identified the defendant as the shooter and was 100 percent sure.

Detective R. later interviewed the defendant's childhood friend that he previously dated; she identified the defendant from a still photograph taken from the surveillance video. She also identified him in person and in the photograph at trial.

The crime scene investigator lifted fingerprints off the cooler inside the store where the surveillance video showed he touched the cooler door. The latent print examiner later testified the prints from the cooler matched the defendant's known standards.

- ***The Motion to Suppress***

Prior to trial, the defendant moved to suppress the manager's eyewitness identification. He argued the identification should be suppressed because: 1) law enforcement employed an unnecessarily suggestive procedure that gave rise to a substantial likelihood of irreparable misidentification; 2) the identification's probative value was outweighed by the danger of unfair prejudice; and 3) the identification violated his due process rights.

The detectives testified at the hearing. Detective P. testified that both he and Detective R. watched the surveillance video from which Detective R. recognized the defendant's girlfriend. Detective P. researched her associates, residences, and case history at the sheriff's office. Detective P. discovered the defendant was one of the girlfriend's known associates. The defendant's photograph was then generated as a possible suspect.

Detective P. testified the photographic lineup was created from a program that produces a list of suspects based on specific characteristics, including height, weight, skin color, hair, tattoos, and beards. The photographic lineup had a black bar above two of the photographs, the defendant's and photograph number 6.

On cross-examination, Detective P. explained the black line above the

defendant's photograph:

> I know it's weird, but it – so when I put together that photo lineup, okay, and I know that my suspect is in a specific position, in order for me to make a different photo lineup, I just hit rearrange, or random placement. Those black lines appear randomly. So it's not like I had to crop that photo out. That's the photo that was in there and when I hit random the line just moves around.

Although he knew where the defendant was positioned in the photograph lineup, he did not tell Detective R.

Detective R. testified he did not see the photographic lineup and could not remember seeing the defendant's photograph prior to administering the lineup. He did nothing to suggest who to pick in the lineup.

Within fifteen seconds, the manager identified the defendant as "the person he saw do the shooting." He indicated he was 100 percent certain and explained he had seen the defendant in his store many times but did not know his name. Detective R. responded, "very good." After Detective R. finished the lineup, Detective P. showed the manager the defendant's picture.

The trial court denied the motion to suppress.

- *The Trial*

The case proceeded to trial. During the trial, the manager identified the defendant and was cross-examined about whether he originally told law enforcement the defendant did not have any facial tattoos and whether he had watched television or media about the crime. The defendant's childhood friend identified the defendant in the courtroom and in the photo from the surveillance video over defense objection. The detectives testified regarding their investigation, including the photographic lineup and the victim's friend's comment at the scene that "they know him," which was admitted over defense objection. The victim's friend also testified. The latent print examiner testified the defendant's prints were found on the cooler.

The defendant requested special jury instructions on eyewitness and expert witness testimony. The trial court denied those requests.

The jury convicted the defendant of first-degree murder. The trial court

4

sentenced him to life in prison without parole. The defendant moved for a new trial or arrest of judgment, which the court denied. He now appeals his conviction and sentence.

- *Issue One: The Motion to Suppress*

The defendant argues the trial court erred in denying his motion to suppress the manager's eyewitness identification because it: 1) was unnecessarily suggestive; 2) led to a substantial likelihood of misidentification; 3) violated Florida's Constitution; and 4) was more prejudicial than probative. The defendant suggests we should adopt a new test for eyewitness identification.

The State responds that we are restricted to the existing eyewitness identification test, and this identification was neither unnecessarily suggestive nor led to a substantial likelihood of misidentification. We find no error in the trial court's ruling on the motion to suppress.

We review an order on a motion to suppress an out-of-court identification for an abuse of discretion. *Walker v. State*, 776 So. 2d 943, 945 (Fla. 4th DCA 2000).

We employ the two-pronged test developed by the U.S. Supreme Court to determine if an out-of-court identification violates due process. *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). First, we must decide if "the police employ[ed] an unnecessarily suggestive procedure in obtaining an out-of-court identification[.]" *Walton v. State*, 208 So. 3d 60, 65 (Fla. 2016). Second, we must consider "the totality of the circumstances," to determine whether "the suggestive procedure g[a]ve rise to a substantial likelihood of irreparable misidentification." *Id.*

The defendant first argues we should modify the *Manson* test in line with other states to account for the array of factors outside the criminal justice system's control that studies have shown contribute to misidentifications. He suggests the current test abridges Florida's constitutional protections.

Because our supreme court expressly adopted *Manson* in *Grant v. State*, 390 So. 2d 341 (Fla. 1980), we are bound to apply its test.[2] *See*

---

[2] The Innocence Project, Inc. and the Innocence Project of Florida filed amici curiae briefs in support of the defendant's argument that Florida's law on eyewitness identification should be updated based on recent research. This sea change must come from our supreme court. Until then, we are bound by *Manson.*

*Putnam Cty. Sch. Bd. v. Debose*, 667 So. 2d 447, 449 (Fla. 1st DCA 1996). Under *Manson*, we first review whether the identification was unnecessarily suggestive.

### a. Unnecessarily Suggestive

The defendant argues the lineup was unnecessarily suggestive because: 1) his photograph had a black bar across the top of it; 2) he did not look similar to the photograph in position six; and 3) his facial features were too dissimilar from the rest of the photographs. He relies on *Walker v. State*, 223 So. 3d 388 (Fla. 5th DCA 2017) and *State v. Dorsey*, 5 So. 3d 702 (Fla. 2d DCA 2009) for support. Neither case dictates a reversal.

In *Walker*, the Fifth District held a photographic lineup was unnecessarily suggestive because the defendant was the only person in the lineup with extensive facial scarring and a blotchy complexion. 223 So. 3d at 389. Similarly, in *Dorsey*, the Second District denied certiorari because the State failed to demonstrate the trial court applied the wrong law in excluding the out-of-court-identification. 5 So. 3d at 706.

Conversely, here, the defendant's photograph was not the only one with a black bar above the photograph; the photograph in position six also had a black bar above it. Nothing in the record suggests the manager's identification was influenced by the black bar. Rather, the manager testified he recognized the defendant as someone who had been in his store before and told Detective R. he was 100 percent sure.

The defendant also argues his photograph was dissimilar to the other photographs. "Generally, photographic arrays have been upheld where they have included 'a reasonable number of persons similar to any person then suspected whose likeness is included in the array.'" *State v. Francois*, 863 So. 2d 1288, 1289 (Fla. 4th DCA 2004) (quoting LaFave, et al., Crim. P. § 7.4(e) (2d ed. 1999)). "Photographs used in lineups are not unduly suggestive if the suspect's picture does not stand out more than those of the others, and the people depicted all exhibit similar facial characteristics." *Id.* at 1289–90.

Here, all six photographs shared similar characteristics: skin color, hair style, and nose and lip shapes. The defendant suggests his head shape, forehead, and eyebrows are dramatically different from the rest, but a "lineup of clones is not required." *United States v. Arrington*, 159 F.3d 1069, 1073 (7th Cir. 1998). While some have more facial hair than others,

the manager was specifically instructed not to focus on facial hair. *See Green v. State,* 641 So. 2d 391, 395 (Fla. 1994).

The defendant next argues the administration of the lineup was unnecessarily suggestive because: 1) the photographs were administered simultaneously, rather than sequentially; 2) the lineup was not double-blind because Detective R. was the lead detective; and 3) Detective R. told the manager "very good" after he selected the defendant.

"The Supreme Court has not adopted a rule that only 'the best' approach (as the latest social science research identifies the best current understanding) can be used." *United States v. Johnson,* 745 F.3d 227, 229 (7th Cir. 2014). In fact, "[t]he Supreme Court of New Jersey, which has gone further than any other appellate tribunal in controlling the methods of obtaining and presenting eyewitness identifications, has declined to require sequential methods exclusively." *Id.* (citing *State v. Henderson,* 208 N.J. 208, 256–58 (2011)). And, double-blind lineups are not required. *See, e.g., State v. Gibson,* 935 So. 2d 611, 613 (Fla. 3d DCA 2006) (quashing a trial court's order requiring, among other things, a double-blind lineup, because the "standard lineup procedure has been repeatedly upheld as constitutionally sound.").

Notwithstanding existing caselaw, the defendant argues our statutes require double-blind administration of lineups. They do not. Section 92.70, Florida Statutes, requires an independent administrator, "a person who is not participating in the investigation of a criminal offense and is unaware of which person in the lineup is the suspect," to administer a lineup. § 92.70(2)(b), Fla. Stat. (2019). The statute also provides that "in lieu of using an independent administrator, a law enforcement agency may conduct a photo lineup eyewitness identification procedure" using:

> 1. An automated computer program that can automatically administer the photo lineup directly to an eyewitness and prevent the lineup administrator from seeing which photograph the eyewitness is viewing until after the procedure is completed.
> . . . .
>
> 3. Any other procedure that achieves neutral administration and prevents the lineup administrator from knowing which photograph is being presented to the eyewitness during the identification procedure.

*Id.* § 92.70(3)(a)(1), (3).

7

Law enforcement complied with section 92.70. Although Detective R. was the lead detective, Detective P. assembled the lineup on a computer program. Detective R. had no part in preparing the lineup nor did he know who was in the lineup before it was administered. And Detective R.'s "very good" comment was made *after* the manager identified the defendant. *See also Rimmer v. State*, 825 So. 2d 304, 317 (Fla. 2002).

In short, law enforcement did not employ an unnecessarily suggestive procedure in obtaining the manager's out-of-court identification.

### b. Substantial Likelihood of Misidentification

The defendant next argues the manager's identification led to a substantial likelihood of misidentification because: 1) his opportunity to view the shooter was brief; 2) his attention was diverted; 3) he described only the shooter's clothing and failed to describe any facial tattoos; and 4) five hours elapsed between the offense and the lineup. The defendant concedes the manager was confident in his identification but argues there is a weak correlation between identification accuracy and confidence, which can be tainted or exaggerated by suggestive identification procedures.

The record reflects the manager saw the defendant in the store several times before the shooting. Although he was busy with other customers, he saw the defendant enter the store, stand in line with his girlfriend, and run away on the surveillance screen. The manager's description of the defendant was consistent with the other eyewitnesses' descriptions. *See Tumblin v. State*, 747 So. 2d 442, 445 (Fla. 4th DCA 1999). He was 100 percent sure of his identification and identified the defendant within fifteen seconds of being shown the photographic lineup.

In short, this photographic lineup did not lead to a substantial likelihood of misidentification.

### c. Section 90.403, Florida Statutes

The defendant's last argument on this issue is that the probative value of the manager's identification was outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. He suggests the probative value is low because the identification is not reliable, while the danger of unfair prejudice is high because juries "tend to overvalue or overweigh eyewitness identification testimony."

"Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (2019). For relevant, probative evidence "to be deemed unfairly prejudicial, it must go beyond the inherent prejudice associated with any relevant evidence." *Martinez v. State*, 265 So. 3d 704, 705 (Fla. 4th DCA 2019) (quoting *State v. Gad*, 27 So. 3d 768, 770 (Fla. 2d DCA 2010)).

Here, the identification was reliable. It was highly probative to identify the defendant as the shooter. The manager had seen the defendant several times before in the store, saw him that day in the store and running from the scene, and was able to identify him in fifteen seconds within hours of the murder. The prejudice is only that inherent with its relevancy.

In short, the identification was more probative than prejudicial.

- *Issue Two: Admission of the Manager's Prior Consistent Statement*

On this issue, the defendant argues the trial court erred in admitting the manager's prior consistent statement because: 1) the cross-examination did not imply improper influence; and 2) even if it did, the statement was made *after* the influence arose.

"A trial court's ruling on the admissibility of evidence is subject to an abuse of discretion standard of review, but the court's discretion is limited by the rules of evidence and the applicable case law." *Horwitz v. State*, 189 So. 3d 800, 802 (Fla. 4th DCA 2015).

At trial, defense counsel asked the manager on cross-examination about the differences in his description of the defendant during trial and in his statements to law enforcement at the crime scene. In doing so, defense counsel asked if he had read newspaper articles about the case. He answered no.

Defense counsel then attempted to impeach the manager with his deposition testimony in which he testified he previously saw the case in the newspapers and on channel 12. On redirect, the State asked the manager if he recalled telling defense counsel the shooter had tattoos on his face and neck during his deposition. The defense objection to this statement was overruled.

On appeal, the defendant argues the prior consistent statement (that

the shooter had facial tattoos) was erroneously admitted because: 1) the cross-examination did not raise an implication of recent fabrication, influence, or motive to lie; and 2) the deposition statement was made after the defendant had an opportunity to review the photographic lineup and newspaper articles. The State responds the cross-examination implied recent fabrication, and the statement was made before the alleged influence arose.

"Generally, prior consistent statements are inadmissible to corroborate or bolster a witness's trial testimony." *Taylor v. State*, 855 So. 2d 1, 22 (Fla. 2003). "Because they are usually hearsay, . . . 'prior consistent statements . . . must qualify under a hearsay exception.'" *Id.* at 22–23 (quoting *Bradley v. State*, 787 So. 2d 732, 743 (Fla. 2001)).

Statements are not hearsay "if . . . the person who made the prior consistent statement testifies at trial and is subject to cross-examination concerning that statement; and the statement is offered to rebut an express or implied charge . . . of improper influence, motive, or recent fabrication." *Id.* at 23 (quoting *Chandler v. State*, 802 So. 2d 186, 197 (Fla. 1997)); *see also* § 90.801(2)(b), Fla. Stat. (2019). "[A] witness's prior consistent statement[] used for rehabilitation must have been made before the existence of a fact said to indicate bias, interest, corruption, or other motive to falsify the prior consistent statement." *Taylor*, 855 So. 2d at 23.

Here, defense counsel cross-examined the manager on his failure to include the defendant's facial tattoos in his description to law enforcement at the crime scene. Defense counsel then asked whether he had seen anything about the case in the news since that description. When the manager said no, defense counsel impeached the manager with his prior deposition testimony where he testified that he saw the case in the news after the incident. Defense counsel then had the manager admit he had seen the news and watched the surveillance video since the crime. As the State suggests, a reasonable interpretation of the cross-examination here implied the manager gave one description at the crime scene, and another after watching the news and surveillance video.

The State concedes that prior consistent statements used for rehabilitation must have been made before the existence of a fact indicating bias but argues the attack on the manager's description of the defendant encompassed the surveillance video he watched before trial, and therefore does not violate the rule. The manager's prior consistent statement in his deposition rebutted the implication that he changed his description of the defendant after watching the news and surveillance video. The trial court did not abuse its discretion in admitting his prior

consistent statement. *See, e.g., Griffith v. State*, 762 So. 2d 1022, 1023 (Fla. 3d DCA 2000) (holding prior consistent statement was admissible to rebut implication of fabrication).

In short, the trial court did not err in admitting the manager's prior consistent statement.

- *Issue Three:    The Admission of the Childhood Friend's Identification*

The defendant argues the trial court erred in admitting his childhood friend's identification of him in a picture from the surveillance video because it was inadmissible hearsay. The State concedes error and we agree but find the error harmless.

The defendant argues the error was not harmless because: 1) the childhood friend was the only other witness to identify the defendant pre-trial; 2) the manager did not pay attention to the defendant because of other customers and failed to tell law enforcement of the defendant's facial tattoos; 3) the fingerprints lifted off the cooler could have been there earlier because the door had not been cleaned for six days; and 4) the State relied on the childhood friend's identification in closing arguments.

The defendant's childhood friend testified she knew the defendant since elementary school and dated him for several years. She identified him in a still photograph from the surveillance video and again at trial. And, she was not the only one to identify him.

In short, for the reasons expressed below, the error was harmless.

- *Harmless Error*

"[U]nder the harmless error test, the State must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." *Vilseis v. State*, 117 So. 3d 867, 871 (Fla. 4th DCA 2013) (quoting *Symonette v. State*, 100 So. 3d 180, 184 (Fla. 4th DCA 2012)). "The focus is on the effect of the error on the trier-of-fact. The question is whether there is a reasonable possibility that the error affected the verdict." *State v. DiGuilio*, 491 So. 2d 1129, 1139 (Fla. 1986).

"Application of the test requires an examination of the entire record by the appellate court including a close examination of the permissible

evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict." *Id.* at 1135.

For the following reasons, any error as to each of the three issues was harmless.

### 1. The Motion to Suppress

We find no error in the court ruling on the motion to suppress. Even if error occurred, we find it harmless.

The manager testified he knew the defendant as a regular customer. Even prior to the pre-trial identification, the manager told Detective R. he saw the defendant and his girlfriend in the store several times before. The surveillance video was played for the jury, which showed the defendant's face. And, the jury asked to replay the surveillance video during deliberations. *See Ibar v. State*, 938 So. 2d 451, 463 (Fla. 2006) (finding the trial court's admission of identification statements was harmless error where "there were other witnesses and items of evidence from which the jury could conclude that [the defendant] was one of the perpetrators of this triple homicide," including a videotape surveillance showed to the jury where the defendant's face was visible). Any error was therefore harmless. *DiGuilio*, 491 So. 2d at 1139.

### 2. The Manager's Prior Consistent Statement

Similarly, we found no error in the admission of the manager's prior consistent statement. Nevertheless, if any error existed, we find it harmless.

The record does not reflect the jury relied on the manager's deposition statement describing the defendant's facial tattoos. At trial, the manager testified the defendant had tattoos. He also explained he told law enforcement at the crime scene the defendant had tattoos although it was not reflected in the police reports. He identified the defendant in a photographic lineup. And the defendant's prints were found on the cooler in the precise location where the surveillance video showed that he opened the cooler door.

Admission of the prior consistent statement was harmless. *Id.*

### 3. Childhood Friend's Identification

Although the State concedes error on this issue and we agree, we find any error harmless.

The manager recognized the defendant as a regular customer and identified him both in the police lineup and in court. Another employee also described the defendant. While the manager did not see the shooting, he saw the defendant running away in the surveillance video.

The defendant's face was visible in the surveillance video, which shows him going to the cooler and touching it precisely where the latent print examiner lifted the prints and matched them to the defendant. The surveillance video was played for the jury. *See Ibar*, 938 So. 2d at 463.

Although the State relied on the childhood friend's testimony in closing, none of the jury questions requested review of her testimony again. The jury requested to re-watch only the surveillance video. There was no reasonable possibility that the error affected the verdict. *DiGuilio*, 491 So. 2d at 1139.

- *Other Issues*

We find the other issues (the denial of defendant's request for special jury instructions on eyewitness identification and expert witness testimony, the admission of the victim's friend's statement to law enforcement, and the expert's testimony concerning the number of times he had been qualified as an expert) without merit and not warranting further discussion.

*Affirmed.*

WARNER and KLINGENSMITH, JJ., concur.

* * *

***Not final until disposition of timely filed motion for rehearing.***

13