TORRUELLA, Circuit Judge
(Dissenting).
The majority today affirms a sentence of 160 years and one month without the possibility of parole for Rivera-Ruperto. The transgression for which Rivera-Ruperto was punished in such an extreme manner was his participation as a security guard in several fake transactions, while the FBI duped Rivera-Ruperto into believing that the composite was actually illegal drugs. The FBI ensured that more than five kilograms of composite moved from one agent’s hands to another at each transaction; the FBI also made sure that the rigged script included Rivera-Ruperto’s possession of a pistol at each transaction. This combination — more than five kilograms of composite, a pistol, and separate transactions — triggered the mandatory consecutive mínimums of 18 U.S.C. § 924(c), which make up 130 years of Rivera-Ruperto’s sentence.
In a real drug transaction, all participants would be guilty of a crime. And, in general, the greater their knowledge of the crime would be, the harsher the law would punish them. In the fictitious transaction we are faced with today, however, only the duped participants, who had no knowledge of what truly transpired, are punished. The other participants are not only excused, but indeed rewarded for a job well done.
If Rivera-Ruperto had instead knowingly committed several real rapes, second-degree murders, and/or kidnappings, he would have received a much lower sentence; even if Rivera-Ruperto had taken a much more active role in, and brought a gun to, two much larger real drug deals, he would still have received a much lower sentence.[22] For these and many other crimes Rivera-Ruperto would have received sentences that would see him released from prison during the natural term of his life. For the fictitious transgressions concocted by the authorities, however, Rivera-Ruperto will spend his entire life behind bars — a sentence given to first-degree murderers, 18 U.S.C. § 1111, or those who cause death by wrecking a train carrying high-level nuclear waste. 18 U.S.C. § 1992.
*20 From the majority’s approval of the draconian sentence imposed in this case, I respectfully dissent. Rivera-Ruperto’s sentence is grossly disproportionate to his offense, and therefore violates the Eighth Amendment to the Constitution. While some seemingly excessively harsh sentences have withstood Eighth Amendment challenges, such harsh sentences have been sanctioned only in the context of recidivists or those who otherwise dedicated themselves to a life of crime — a context that explained the severity of the sentences. But Rivera-Ruperto has no criminal record, nor has he dedicated himself to a life of crime. Not even under the infamous § 924(c) has a first-time offender like Rivera-Ruperto ever been condemned to spend his entire life in jail.[23]
I. The Eighth Amendment
The Court’s cases addressing the proportionality of sentences fall within two general classifications. The first involves challenges to the length of term-of-years sentences given all the circumstances in a particular case. The second comprises cases in which the Court implements the proportionality standard by certain categorical restrictions on the death penalty. In the first classification the Court considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive.
Graham v. Florida, 560 U.S. 48, 59, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010).
The second classification has evolved to encompass not only the death penalty, but also prison sentences. See id. at 61-62, 82, 130 S.Ct. 2011 (holding that a sentence of life without the possibility of parole for non-homicide offenses by juveniles violates the Eighth Amendment); Miller v. Alabama, 567 U.S. 460, 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012) (holding that a mandatory sentence of life without parole for juvenile offenders violates the Eighth Amendment).
In the present case, this court is faced with a challenge that falls under the first classification: a challenge to the length of Rivera-Ruperto’s sentence based on the circumstances of his case; in other words, an as-applied constitutional challenge to the length of Rivera-Ruperto’s sentence.
The Supreme Court’s jurisprudence in this first classification is animated by the principle of proportionality in punishment, as well as by deference to the legislature’s judgment as to what punishment is merited.
A. Proportionality
The principle of proportionality is deeply embedded into the very roots of our legal system. Solem v. Helm, 463 U.S. 277, 284, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). “In 1215 three chapters of Magna Carta were devoted to the rule that ‘amercements’ [the most common criminal sanction at the time] may not be excessive” — and disproportionate penalties were invalidated accordingly by the royal courts. Id. at 284-85, 103 S.Ct. 3001. When the Framers adopted the language of the Eighth Amendment from the English Bill of Rights — which provided that “excessive Baile ought not to be required nor excessive Fines imposed *21 nor cruell and unusuall Punishments inflicted” — they also adopted the principle of proportionality, for it was a major theme of the era that Americans had all the rights of English subjects. Id. at 285-86, 103 S.Ct. 3001.
The principle of proportionality is not merely of historical interest, however. In that same case, the Court went on to observe that “[t]he constitutional principle of proportionality has been recognized explicitly in this Court for almost a century.” M. at 286, 103 S.Ct. 3001. The Court proceeded to cite from no fewer than eleven of its precedents ranging from 1892 to 1982, in which the principle of proportionality was recognized[24] — and this was not even an exhaustive list. See id. at 287-88, n.ll, 12, 103 S.Ct. 3001. The Court proceeded to hold that a punishment of life without the possibility of parole was disproportionate to the offense of issuing a no account check in the amount of $100 (even though it was the defendant’s seventh offense) — and that this sentence therefore violated the Eighth Amendment. Id. at 303, 103 S.Ct. 3001.
The Supreme Court has continued to recognize that prison sentences must be proportional under the Eighth Amendment in every case that has dealt with that question since Solem.[25] See Harmelin v. Michigan, 501 U.S. 957, 997, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring)[26] (“[t]he Eighth Amendment proportionality principle also applies to noncapital sentences”); Ewing v. California, 538 U.S. 11, 20, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (“The Eighth Amend *22 ment ... contains a ‘narrow proportionality principle’ that ‘applies to noncapital sentences.’ ”) (internal citations omitted); id. at 33, 123 S.Ct. 1179 (Stevens, Souter, Ginsburg, Breyer, JJ., dissenting) (“The concurrences prompt this separate writing to emphasize that proportionality review is not only capable of judicial application but also required by the Eighth Amendment.”); Lockyer v. Andrade, 538 U.S. 63, 72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (“Through this thicket of Eighth Amendment jurisprudence, one governing legal principle emerges as ‘clearly established’ under § 2254(d)(1): A gross disproportion-ality principle is applicable to sentences for terms of years.”); Graham, 560 U.S. at 59, 130 S.Ct. 2011 (“The concept of proportionality is central to the Eighth Amendment.”); Miller, 132 S.Ct. at 2463 (same).[27]
B. Deference to the Legislature
The same case law is also clear that respect for the judgment of the legislature as to what constitutes appropriate punishment is in order. See, e.g., Solem, 463 U.S. at 290, 103 S.Ct. 3001 (“[w]e hold as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted. Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes”); Ewing, 538 U.S. at 24, 123 S.Ct. 1179 (noting that “[tjhough three strikes laws may be relatively new, our tradition of deferring to state legislatures in making and implementing such important policy decisions is longstanding”, and adding “[o]ur traditional deference to legislative policy choices finds a corollary in the principle that the Constitution ‘does not mandate adoption of any one penological theory’ ”). The proportionality principle is therefore sometimes described as “narrow,” and only in “exceedingly rare” instances of “gross disproportionality” should the courts apply the Eighth Amendment to overturn a sentence. See, e.g., id. at 20, 21,123 S.Ct. 1179.
C. The Three-Step Analysis
Thus it is clear that proportionality is of crucial importance in our sentencing law, but its “precise contours ... are unclear”. Lockyer, 538 U.S. at 72, 73, 123 S.Ct. 1166. It is also clear that these contours are primarily determined by deference to the legislature’s judgment as to appropriate punishment. This has led to the emergence of a three-step analysis that assesses both proportionality and the legislature’s judgment. In performing this three-part test, courts must look at the actual severity of a defendant’s offenses (as opposed to merely looking at the laws he violated), as well as look at the actual severity of the penalty (rather than merely at the name of the penalty); and courts must give recidivism great weight when assessing the gravity of an offense, and thus when justifying a harsh sentence.
1. The Three Steps
The controlling opinion in Harmelin explained its approach for determining whether a sentence for a term of years is grossly disproportionate for a particular defendant’s crime. A court must begin by comparing the gravity of the offense and the severity of the sentence. ‘[I]n the rare case in which [this] thresh *23 old comparison ... leads to an inference of gross disproportionality’ the court should then compare the defendant’s sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. If this comparative analysis Validated] an initial judgment that [the] sentence is grossly disproportionate,’ the sentence is cruel and unusual.
Graham, 560 U.S. at 60, 180 S.Ct. 2011 (internal citations omitted; alterations in original).
2. Actual Severity of the Offense and of the Punishment
In performing the three-step analysis, the Supreme Court has considered the actual severity of the acts committed by defendants, as well as the importance of the laws they violated. See, e.g., Ewing, 538 U.S. at 18-19, 28, 123 S.Ct. 1179 (detailing defendant’s past nine criminal convictions and considering the dollar value of the merchandise stolen by the defendant in his latest conviction).
Similarly, the Supreme Court has been clear that for the purposes of the three-step analysis, courts must look to the actual severity of the penalty — that is, the actual amount of time a defendant will serve in prison — and not to what his penalty is called.
[The defendant’s] present sentence is life imprisonment without possibility of parole.... Helm will spend the rest of his life in the state penitentiary. This sentence is far more severe than the life sentence we considered in Rummel v. Estelle. Rummel was likely to have been eligible for parole within 12 years of his initial confinement, a fact on which the Court relied heavily.
Solem, 463 U.S. at 297, 103 S.Ct. 3001.[28]
The Supreme Court reaffirmed this approach in 2012, its most recent pronouncement on the issue:
The two 14-year-old offenders in these cases were convicted of murder and sentenced to life imprisonment without the possibility of parole.... State law mandated that each juvenile die in prison even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence (for example, life with the possibility of parole) more appropriate.
Miller, 132 S.Ct. at 2460 (original emphasis).
3. Recidivism
The Supreme Court has upheld several harsh sentences for seemingly relatively minor crimes. The Supreme Court reasoned that the severity of these sentences was justified because they involved recidivist offenders and recidivism was a legitimate basis on which a legislature could elect to sentence more harshly. For instance, in Rummel v. Estelle, the Supreme Court upheld a sentence of life with the possibility of parole for obtaining $120.75 under false pretenses, but reasoned that:
Moreover, given Rummel’s record, Texas was not required to treat him in the same manner as it might treat him were this his first “petty property offense.” *24 Having twice imprisoned him for felonies, Texas was entitled to place upon Rummel the onus of one who is simply unable to bring his conduct within the social norms prescribed by the criminal law of the State.
The purpose of a recidivist statute such as that involved here is not to simplify the task of prosecutors, judges, or juries. Its primary goals are to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time. This segregation and its duration are based not merely on that person’s most recent offense but also on the propensities he has demonstrated over a period of time during which he has been convicted of and sentenced for other crimes.
Rummel, 445 U.S. at 284, 100 S.Ct. 1133.
In Ewing, to use another example, the Supreme Court devoted an entire section of its opinion to explaining that the defendant’s sentence of 25 years to life for stealing three golf clubs under California’s three strikes law must be understood in the context of recidivism, and explained: “California’s justification is no pretext. Recidivism is a serious public safety concern in California and throughout the Nation.” Ewing, 538 U.S. at 26, 123 S.Ct. 1179. “In weighing the gravity of Ewing’s offense, we must place on the scales not only his current felony, but also his long history of felony recidivism.” Id. at 29, 123 S.Ct. 1179.
Indeed, of the seven cases that address as-applied proportionality challenges under the Eighth Amendment, five deal with recidivist offenders.[29] Of the remaining two cases, one (Harmelin) deals with a career criminal (another important justification for meting out sentences that appear harsh on their face); and in the final case (Weems) the punishment was held to violate the Eighth Amendment.
II. Discussion
A. Three-Step Test
Rivera-Ruperto’s case has no difficulty clearing the first step of the three-step analysis, in which “[a] court must begin by comparing the gravity of the offense and the severity of the sentence. ‘[I]n the rare case in which [this] threshold comparison ... leads to an inference of gross dispro-portionality’ the court should then [proceed to the second step of the analysis].” Graham, 560 U.S. at 59, 130 S.Ct. 2011 (internal citations omitted). In over forty years on the federal bench, I have never seen so disproportionate a penalty handed down, particularly where the offense is based on fiction. I am certainly not alone in finding this sentence to be vastly disproportionate to the offense. Speaking on behalf of the Judicial Conference of the United States, Judge Paul Cassell, after describing mandatory minimum sentences — in particular under § 924(c) — as “one-size-fits-all injustice,” “bizarre,” “irrational,” “cruel and unusual, unwise and unjust,” concluded that the mandatory minimum system of sentencing “must be abandoned in favor of a system based on principles of fairness and proportionality.” [30] The Sentencing Commission, too, *25 views sentences such as Rivera-Ruperto’s as disproportionate — not only would its Guidelines recommend a far lower sentence, but the Commission stated that sentences as a result of § 924(c) stacking “can lead to sentences that are excessively severe and disproportionate to the offense committed.”[31] As an example, the Commission cited the case of Weldon Angelos, a marijuana dealer who received a sentence of 61.5 years (55 years of which was mandatory minimum sentence under § 924(c) for bringing (but not using or brandishing) a gun to three marijuana deals)[32] — Rivera-Ruperto, however, is faced with a sentence of 160 years (130 years due to stacking under § 924(c)).
Rivera-Ruperto’s case also has no trouble passing the second step, namely a comparison of “the defendant’s sentence with the sentences received by other offenders in the same jurisdiction.” Graham, 560 U.S. at 60,130 S.Ct. 2011. “If more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive.” Solem, 463 U.S. at 291, 103 S.Ct. 3001. Rivera-Ruperto received, effectively, a mandatory sentence of life without the possibility of parole (“LWOP”) — because 160 years is about two human lifetimes. The district court has effectively condemned him to die in prison. As noted above, this court is to consider the actual time a defendant is to spend incarcerated — in Rivera-Ruperto’s case, that means his whole life. See supra Section I.C.2. If, however, one compares his offense to other offenses that would result in mandatory LWOP under federal law, then his offense pales in comparison. I have been able to locate forty-nine statutes that prescribe a mandatory penalty of LWOP.[33] Seventeen of these are for first degree murder.[34] The general statute imposing a mandatory minimum for first degree murder, 18 U.S.C. § 1111, goes back to 1790. Congress has steadily widened its application since then, and it now covers many specific situations, from killing the president, 18 U.S.C. § 1751(a), to killing an eggs product quality inspector, 21 U.S.C. § 1041(b). Other statutes mandate a sentence of LWOP for such crimes as genocide killing — perhaps the gravest crime imaginable — 18 U.S.C. § 1091, wrecking a train carrying high level nuclear material and thereby causing death, 18 U.S.C. § 1992, and hostage taking resulting in death, 18 U.S.C. § 1203. Rivera-Ruperto’s offenses simply do not rise to the level of the offenses in this chart. The complete chart follows.
*26 [[Image here]]
*27 [[Image here]]
*28 [[Image here]]
*29 [[Image here]]
*30 [[Image here]]
If one approaches the analysis under this second step from another angle, one arrives at the same conclusion. That is, if one looks to offenses far graver than those Rivera-Ruperto committed, one finds that they carry far less severe sentences than Rivera-Ruperto’s. In sentencing to a mandatory term of 55 years a defendant who had committed three offenses under § 924(c), Judge Cassell compiled a table of *31 offenses under federal law that would result in a shorter sentence than those 55 years — but were clearly graver than the defendant’s offenses. Judge Cassell’s comparison applies even to Rivera-Ruperto’s considerably longer sentence. Examples from his table include “an aircraft hijacker (298 months), a terrorist who detonates a bomb in a public place (285 months), a racist who attacks a minority with the intent to kill and inflicts permanent or life-threatening injuries (210 months), a second-degree murderer, or a rapist.” United States v. Angelos, 345 F.Supp.2d 1227, 1244-45 (D. Utah 2004), aff'd, 433 F.3d 738 (10th Cir. 2006). Judge Cassell went on to compare the sentence before him to triple offenders, and arrived at the conclusion that,
[ajmazingly, [the Defendant’s] sentence under § 924(c) is still far more severe than criminals who committed, for example, three aircraft hijackings, three second-degree murders, three kidnappings, or three rapes.... [Defendant] will receive a longer sentence than any three-time criminal, with the sole exception of a marijuana dealer who shoots three people. ([The defendant] still receives a longer sentence than a marijuana dealer who shoots two people.)
Id. at 1246.
Similarly telling is a comparison to the federal three-strikes provision, 18 U.S.C. § 3559(c). This statute mandates that a court impose a sentence of LWOP on a criminal with two prior serious violent felony convictions when this criminal commits a third such offense — but such an offender can then be released at age 70 if he has served at least 30 years in prison under 18 U.S.C. § 3582(c)(1), the so-called “compassionate release clause.” That is, if Rivera-Ruperto had committed a violent felony, been convicted, then committed a second violent felony, then been convicted again, and then committed a third violent felony, and been convicted yet again, he — even though a seemingly incorrigible recidivist — would have been eligible for release at age 70. As a first-time offender sentenced under § 924(c), however, Rivera-Ruperto will never be eligible for release.[37]
*32 At the third, and final, step of the analysis, “the court should ... compare [Rivera-Ruperto’s sentence] ... with the sentences imposed for the same crime in other jurisdictions. If this comparative analysis ‘validate^] an initial judgment that [the] sentence is grossly disproportionate,’ the sentence is cruel and unusual.” Graham, 560 U.S. at 60, 130 S.Ct. 2011 (internal citations omitted). Rivera-Ruperto’s case also clears this final step without difficulty. Sentences for offenses like Rivera-Ruperto’s are much lower under state law.[38] (This brings with it a number of serious issues, such as prosecutors choosing to bring cases in federal court merely because of the higher sentences — but such issues are not the focus of this dissent.).[39] There is also some suggestion that courts may need to look to foreign law in this step of the analysis. In cases involving the second classification of Eighth Amendment challenges — applying categorical restrictions on the death penalty or LWOP — the Supreme Court “has looked beyond our Nation’s borders for support for its independent conclusion that a particular punishment is cruel and unusual.... Today we continue that longstanding practice in noting the global consensus against the sentencing practice in question.” Graham, 560 U.S. at 80, 130 S.Ct. 2011. It is unclear whether in the first classification of Eighth Amendment challenges — such as the as-applied challenge before us today — courts should also look to foreign law. I therefore note that foreign law further supports the proposition that Rivera-Ruperto’s sentence is out of proportion to his crime, for “LWOP ... scarcely exists elsewhere in the world. Yet today, the number of defendants sentenced to LWOP by American courts approaches 50,000.... In fact, what separates the American criminal justice system from the rest of the world, and brands it as distinctively harsh, is the number of inmates dispatched to prison for the duration of their lives, without offering a legal mechanism for freedom.” [40] Indeed, Germany, France, and *33 Italy have declared LWOP to be unconstitutional, and other European countries apply it only very rarely[41]
B. Additional Observations
The analysis could stop here. But because this is such a rare case, a few additional observations are in order.
1. Direct Comparison to Other Cases
A direct comparison of Rivera-Ruperto’s offense and its sentence to offenses and their sentences that the Supreme Court held constitutional is enlightening. There are five such cases. See supra, Section I.C.3. Four of these cases involve recidivists — and the Supreme Court weighed the recidivism heavily in its proportionality analysis. See id. The fifth case involved a career criminal, another important factor in determining the appropriate sentence. See id. However, Rivera-Ruperto is neither a recidivist nor a career criminal. He is a first-time offender who has not led a life of crime. I therefore place his crime on one side of the scales — without adding the weight of recidivism or a career of crime— and his sentence on the other. And the weight of the sentence dwarfs the weight of his offense.
Such a direct comparison also holds if the present case is compared to cases from other circuits. The Government, in its 28j letter, has provided this court with eleven eases of sentences from 55 to 186 years given under § 924(c).[42] The Government notes that these lengthy sentences were *34 “based largely on recidivist violations of § 924(c).” In fact, only three of these cases concerned recidivist offenders; six involved career criminals; the final one involved terrorists who were involved in, inter alia, planning the attacks on 9/11. It is telling indeed that in providing this court with cases in which sentences of comparable length to Rivera-Ruperto’s weathered Eighth Amendment challenges, the Government has presented this court with such grave offenses as:
• Seven bank robberies (in four of which a firearm was brandished) by “a repeat bank robber whose criminal record reflects a life of violent crime interrupted only by terms of imprisonment.” Arrington, 159 F.3d at 1073.
• A defendant who “was convicted of six separate robberies, each of which involved the brandishing of a firearm.” Watkins, 509 F.3d at 283. Although a first-time offender, the defendant “and/or his accomplices entered the homes of victims by force and threatened to seriously harm or kill not only the victims, but, in multiple cases, their spouses and small children.” Id.
• Defendants who were involved in the planning of the terrorist attack on 9/11 and who were convicted on “various counts related to a conspiracy to wage armed conflict against the United States and a conspiracy to wage armed conflict against a country with whom the United States is at peace.” Khan, 461 F.3d at 483.
Thus, the Government confirms that when long sentences are applied to serious offenses by recidivists, career criminals, or terrorists, the Eighth Amendment does not protect the offenders, for the severe punishment is not grossly disproportionate to the grave crimes. But Rivera-Ruperto is a first-time offender; he is no career criminal; and he is no terrorist. Note that even in the case of recidivist, but minor, offenses, the punishment may violate the Eighth Amendment. See Ramírez v. Castro, 365 F.3d 755 (9th Cir. 2004) (holding that a sentence of 25 years to life for a third shoplifting offense violated the Eighth Amendment).
2. Penological Goals
There is also a suggestion in the case law that courts may consider penological goals in their analysis, specifically: deterrence, retribution, rehabilitation, and incapacitation. Ewing, 538 U.S. at 24, 123 S.Ct. 1179. As for deterrence, harsh punishment can have a deterrent effect, but deterrence alone cannot justify disproportionate punishment: “The inquiry focuses on whether, a person deserves such punishment, not simply on whether punishment would serve a utilitarian goal. A statute that levied a mandatory life sentence for overtime parking might well deter vehicular lawlessness, but it would offend our felt sense of justice”. Rummel, 445 U.S. at 288, 100 S.Ct. 1133 (Powell, J., dissenting). As for retribution, it is not clear how Rivera-Ruperto has caused any injury — for the transaction was a sham — but even if one ignores that obstacle, Rivera-Ruperto clearly caused less of an injury than those who receive LWOP under federal law, or, for that matter, than those who receive a lesser punishment under federal law. See supra, Section II.A. Indeed, had Rivera-Ruperto been a drug dealer himself, and transacted a vast quantity of real drugs in a single transaction to which he brought a gun, he would undoubtedly have received a much lower sentence. Id. Rehabilitation is clearly not served here, because the current sentence means that the law has judged Rivera-Ruperto to be beyond rehabilitation — something that may be understandable in the case of recidivists who have demonstrated that punishment does not change their ways — but it is troubling *35 indeed to say that a first-time offender will not be given a chance to learn from his mistakes. Finally, as to incapacitation, Rivera-Ruperto does not present such a danger to society that society needs to be protected from him forever.
This analysis of penological goals highlights another facet of the present case that deserves pause. Rivera-Ruperto’s offenses involved a sham drug transaction, at which sham drugs were transacted. “Proportionality — the notion that the punishment should fit the crime — is inherently a concept tied to the penological goal of retribution.” Ewing, 538 U.S. at 31, 123 S.Ct. 1179 (Scalia, J., concurring). But Rivera-Ruperto did no injury, and retribution is therefore not in order. This affects the proportionality analysis. For the purposes of proportionality, participation in a sham drug deal and a real drug deal weigh differently, because retribution applies in the latter, but not in the former. That is not to say that when a sentence is given out for a sham drug deal as if it were a real drug deal, then that sentence necessarily violates the Eighth Amendment. For while such a sentence might be disproportionate, it would not necessarily be “grossly disproportionate” so as to violate the Eighth Amendment. But as the length of a sentence for a sham deal is multiplied, so is its disproportionality. This is simply arithmetic and common sense.
3. The Legislature’s Judgment
The three-step analysis already incorporates due respect for the judgment of the legislature as to the severity of penalties, and, as shown above, Rivera-Ruperto’s case passes that analysis. Because the judgment of the legislature deserves great deference, however, it is worth pointing out that, on the particular facts of this case, I am not questioning the judgment of the legislature. Rather, § 924(c), as the late Chief Justice Rehnquist pointed out, presents a good example of “unintended consequences” of legislative action.[43] Indeed, § 924(c) was the result of a floor amendment (so there is no legislative history) passed by a legislature that wanted to appear tough on gun crime soon after the assassinations of Robert Kennedy and Martin Luther King, Jr.[44] Not only were the mínimums in that law much lower than they have become since, but — crucially— the law was understood as a recidivist statute for a good 25 years. It was not until Deal v. United States, 508 U.S. 129, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993), that the statute became applied the way it is today — not as a recidivist statute, but rather as one that requires stacking of mandatory mínimums on first-time and recidivist offenders alike. Not only is this court generally cautious to infer anything from Congressional inaction, but in this case, it would not even make sense to try. For Congress’s inaction cuts both ways: for the first 25 years after § 924(c) was enacted, the statute applied to recidivists only; after Deal, that changed — but Congress did not act on either understanding of the statute. Furthermore, as has been pointed out countless times, applications of § 924(c) such as in the case before us today contravene the intent of Congress in many ways: most importantly, § 924(c) has led to significant sentencing disparity, di *36 rectly contradicting the intent behind the major sentencing reform of the 1980s. See, e.g., Stephen Breyer, Federal Sentencing Guidelines Revisited, 1999 WL 730985, Fed. Sent’g. Rep. 11(4)(1999). This is yet another facet of the present case that distinguishes it from this court’s decision in, for instance, Polk. See supra, n.20. In that case, this court was faced with a harsh sentence — but that sentence was clearly so intended by Congress, Congress had clearly resolved that the offense in question deserved that harsh penalty. But in the present case, this court is faced not with a Congressional assessment of the gravity of this offense, but rather with an unintended consequence of a statute hastily implemented and judicially altered.
III. Conclusion
The present case is “hen’s-teeth rare”. Polk, 546 F.3d at 76. It may very well be even rarer than that. I would hold that Rivera-Ruperto’s sentence violates the Eighth Amendment. Indeed, the present case is so rare that it is distinguishable from the cases in which the Supreme Court rejected Eighth Amendment challenges to sentences for a term of years (already rare cases), and it is also distinguishable from cases the Government cited in which other circuits rejected Eighth Amendment challenges to sentences under § 924(c) (also rare cases). Never before has a first-time offender who has not dedicated his life to crime been condemned to spend his entire life in prison for a transgression such as Rivera-Ruperto’s, not even in cases in which the transgression was real — and Rivera’s-Ruperto’s transgression is fictitious.
The Government has effectively asked this court to pronounce the Eighth Amendment dead for sentences for a term of years. I respectfully refuse to join in this pronouncement. “Unless we are to abandon the moral commitment embodied in the Eighth Amendment, proportionality review must never become effectively obsolete.” Graham, 560 U.S. at 85, 130 S.Ct. 2011 (Stevens, Ginsburg, Sotomayor, JJ., concurring).

. See, e.g., United States v. Carlos Cruz, 352 F.3d 499, 509-10 (1st Cir. 2003) (affirming a sentence of 32 years given to an actual drug dealer — who was caught with actual cocaine, heroin, cocaine base, two machine guns, a rifle, a pistol, and a large amount of ammunition' — on seven counts related to possession with intent to distribute illegal drugs and to possession of firearms); United States v. Grace, case no. 1-16-cr-0039-001 (D. Maine Dec. 13, 2016) (sentence of 15 years for conspiracy to distribute and possess 100 or more grams of heroin. Defendant had two prior convictions and admitted to importing more than 20,000 bags of cocaine).

. See infra Section II.A. Although § 924(c) has rightly been the subject of much scathing criticism, the statute as such is not the focus of this dissent. See, e.g., Judge Paul Cassell, Statement on Behalf of the Judicial Conference of United States from U.S. District Judge Paul Cassell before the House Judiciary Committee Subcommittee on Crime, Terrorism, and Homeland Security, 2007 WL 3133929, Fed. Sent’g Rep. 19(5) (2007). Rather, what is at issue today is the proportionality of Rivera-Ruperto’s sentence, not the proportionality of sentences under § 924(c) in general.

.To wit: O'Neil v. Vermont, 144 U.S. 323, 339-40, 12 S.Ct. 693, 36 L.Ed. 450 (1892) (Field, J., dissenting) (the Eighth Amendment "is directed ... against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged”); Trop v. Dulles, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion); id. at 111, 78 S.Ct. 590 (Brennan, J., concurring); id. at 125-26, 78 S.Ct. 590 (Frankfurter, J., dissenting). Weems v. United States, 217 U.S. 349, 367, 372-73, 30 S.Ct. 544, 54 L.Ed. 793 (1910) ("that it is a precept of justice that punishment for crime should be graduated and proportioned to offense,” and endorsing the principle of proportionality as a constitutional standard); Robinson v. California, 370 U.S. 660, 667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) ("But the question [of excessive punishment under the Eighth Amendment] cannot be considered in the abstract. Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold.”); Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (death penalty excessive for felony murder when defendant did not take life, attempt to take life, or intend that a life be taken or that lethal force be used); Coker v. Georgia, 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality opinion) ("sentence of death is grossly disproportionate and excessive punishment for the crime of rape”); id. at 601, 97 S.Ct. 2861, (Powell, J., concurring in the judgment in part and dissenting in part) (“ordinarily death is disproportionate punishment for the crime of raping an adult woman”); Hutto v. Finney, 437 U.S. 678, 685, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); Ingraham v. Wright, 430 U.S. 651, 667, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); Gregg v. Georgia, 428 U.S. 153, 171-72, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); Hutto v. Davis, 454 U.S. 370, 374, and n.3, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982) (per curiam) (recognizing that some prison sentences may be constitutionally disproportionate); Rummel v. Estelle, 445 U.S. 263, 272, n.11, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) ("[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences [willhe] exceedingly rare”).

. I here limit my consideration to non-capital cases, because capital cases fall within the second classification of Eighth Amendment proportionality challenges. Note, however, that in capital cases, the principle of proportionality certainly applies as well. See, e.g., Graham, 560 U.S. at 59-61, 130 S.Ct. 2011.

. This concurrence has since been described as "controlling.” Graham, 560 U.S. at 59, 130 S.Ct. 2011.

. Although the position that the Eighth Amendment does not contain a proportionality principle was occasionally raised, it never achieved a majority in the Supreme Court, and has been squarely rejected. See, e.g., Miller, 132 S.Ct. at 2483 ("The [Eighth Amendment] does not contain a proportionality principle.”) (Thomas, Scalia, JJ., dissenting) (internal citation omitted).

. The Court explicitly rejected the Government’s argument that the possibility of executive clemency made a sentence of life without the possibility of parole the same as a sentence of life with the possibility of parole. Id. at 303, 103 S.Ct. 3001 ("The possibility of commutation is nothing more than a hope for 'an ad hoc exercise of clemency.’ It is little different from the possibility of executive clemency that exists in every case in which a defendant challenges his sentence under the Eighth Amendment. Recognition of such a bare possibility would make judicial review under the Eighth Amendment meaningless.”).

. To wit, Rummel, Hutto, Solem, Ewing, Lockyer.

. Judge Paul Cassell, Statement on Behalf of the Judicial Conference of United States from U.S. District Judge Paul Cassell before the House Judiciary Committee Subcommittee on Crime, Terrorism, and Homeland Security, 2007 WL 3133929, Fed. Sent’g Rep. 19(5) (2007) (quoting Senior Judge Vincent L. Bro-derick, Southern District of New York, speaking for the Criminal Law CommRRep. 19(5) *25 (2007) (quoting Senior Judge Vincent L. Bro-derick, Southern District of New York, speaking for the Criminal Law Committee of the Judicial Conference in testimony before the Subcommittee on Crime and Criminal Justice of the House Committee on the Judiciary, July 28, 1993)).

. United States Sentencing Commission, 2011 Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 359 (2011).

. Id. n.903.

. See United States Sentencing Commission, Mandatory Minimum Penalties in the Federal Criminal Justice System, App. A (2011).

. Note that the statutes permit the death penalty for first degree murder. 18 U.S.C. § 1111. Because the statutes only mandate a sentence of LWOP and the death penalty is given only rarely, I include the statutes in the comparison. After all, the statutes reflect Congress’s judgment that first degree murder, without more — already a heinous offense far worse that Rivera-Ruperto’s — is adequately punished by LWOP.

. See also Angelos, 345 F.Supp.2d at 1250-51 ("The irrationality only increases when section § 924(c) is compared to the federal 'three strikes' provision. Criminals with two prior violent felony convictions who commit a third such offense are subject to 'mandatory' life imprisonment under 18 U.S.C. § 3559(c) — the federal ‘three-strikes’ law. But then under 18 U.S.C. § 3582(c)(1) — commonly known as the 'compassionate release’ provision — these criminals can be released at age 70 if they have served 30 years in prison. But because this compassionate release provision applies to sentences imposed under § 3559(c) — not § 924(c) — offenders like [the Defendant] are not eligible. Thus, while the 24-year-old [Defendant] must serve time until he is well into his 70’s, a 40-year-old recidivist criminal who commits second degree murder, hijacks an aircraft, or rapes a child is potentially eligible for release at age 70. In other words, mandatory life imprisonment under the federal three-strikes law for persons guilty of three violent felony convictions is less mandatory than mandatory time imposed on the first-time offender under § 924(c). Again, the rationality of this arrangement is dubious.
This possibility, too, is no mere hypothetical. This morning, the court had before it for sentencing Thomas Ray Gurule. Mr. Gurule is 54-years-old with a lifelong history of criminal activity and drug abuse. He has spent more of his life incarcerated than he has in the community. He has sixteen adult criminal convictions on his record, including two robbery convictions involving dangerous weapons. His most recent conviction was for carjacking. In August 2003, after failing to pay for gas at a service station, Mr. Gurule was pursued by the station manager. To escape, Mr. Gurule broke into the home of a young woman, held her at knife point, stole her jewelry, and forced her to drive him away from the scene of his crimes. During the drive, Mr. Gurule threatened both the woman and her family.
*32 For this serious offense — the latest in a long string of crimes for which he has been convicted — the court must apparently sentence Mr. Gurule to "life” in prison under 18 U.S.C. § 3559(c). But because of the compassionate release provision, Mr. Gurule is eligible for release after serving 30-years of his sentence. Why Mr. Gurule, a career criminal, should be eligible for this compassionate release while [the Defendant is not] is not obvious to the court.”).

. Erik Luna and Paul Cassell, Mandatory Minimalism, 32 Cardozo L. Rev. 1, 16 (2010) ("Most drug and weapons crimes amenable to federal mandatory mínimums are actually prosecuted in state courts pursuant to state laws carrying much lower sentences.”) (emphasis added).

. Id. (“It is hardly disputed, however, that the possibility of severe punishment can influence the choice of whether to pursue a federal or state prosecution. For some, this prospect raises serious questions about the propriety of bringing charges in federal rather than state court, particularly where the prosecution is pursued, not because the case implicates a special national interest, but because it jacks up the potential punishment.”). See also Angelos, 345 F.Supp.2d at 1243 ("Indeed, the government conceded that [the Defendant’s] federal sentence [of 55 years in prison] after application of the § 924(c) counts is more than he would have received in any of the fifty states.”); Id. at 1259 ("[Defendant's] sentence [of 55 years under § 924(c) ] is longer than he would receive in any of the fifty states. The government commendably concedes this point in its brief, pointing out that in Washington State [the Defendant] would serve about nine years and in Utah would serve about five to seven years.”).

.Craig S. Lerner, Who's Really Sentenced to Life Without Parole?: Searching for "Ugly Disproportionalities" in the American Criminal Justice System, 2015 Wis. L. Rev. 789, 792 (2015). See Ashley Nellis, Throwing Away the Key: The Expansion of Life without Parole Sentences in the United States, Fed. Sent’g. *33 Rep. 23(1) (2010), 2010 WL 6681093 at *30 (“In many other industrialized nations, serious offenders are typically released after a maximum prison term of no more than thirty years. For instance, in Spain and Canada, the longest sentence an offender can receive is twenty-five or thirty years. In Germany, France, and Italy, LWOP has been declared unconstitutional. In the United Kingdom, it is allowable, but used quite sparingly; according to a recent estimate, only twenty-three inmates were serving this sentence. In Sweden, parole-ineligible life sentences are permissible, but never mandatory. The Council of Europe stated in 1977 that 'it is inhuman to imprison a person for life without the hope of release,’ and that it would ‘be compatible neither with the modern principles on the treatment of prisoners ... nor with the idea of the reintegration of offenders into society.’ ”) (footnotes omitted).

. Id.

. To wit: United States v. Wiest, 596 F.3d 906 (8th Cir. 2010); United States v. McDonel, 362 Fed.Appx. 523 (6th Cir. 2010); United States v. Walker, 473 F.3d 71 (3d Cir. 2007); United States v. Watkins, 509 F.3d 277 (6th Cir. 2007); United States v. Khan, 461 F.3d 477 (4th Cir. 2006); United States v. Angelos, 433 F.3d 738 (10th Cir. 2006); United States v. Hungerford, 465 F.3d 1113 (9th Cir. 2006); United States v. Beverly, 369 F.3d 516 (6th Cir. 2004); United States v. Marks, 209 F.3d 577 (6th Cir. 2000); United States v. Arrington, 159 F.3d 1069 (7th Cir. 1998). The Government also cites United States v. Hernández-Soto, No. 12-2210 (1st Cir. Aug. 19, 2015); although Hernández-Soto did involve a lengthy sentence, there was no Eighth Amendment challenge in that case, and I therefore do not consider it here. Finally, the Government cites United States v. Polk, 546 F.3d 74 (1st Cir. 2008), a case in which this court rejected an Eighth Amendment challenge to a fifteen-year sentence imposed under 18 U.S.C. § 2251(e). The defendant in Polk had engaged in online conversation with a person he thought was a 13-year-old girl, and he pressured her to take sexually explicit photographs of herself and to send them to him. In addition, "The presentence investigation report told a seamy story: it revealed an earlier conviction for aggravated sexual assault on a toddler, sexual involvement with teenage girls on at least two occasions, and yet another series of sexually charged computer chats with a minor. The defendant conceded these facts....” Polk, 546 F.3d at 75. I see no difficulty in reconciling the proposition that Polk's sentence of 15 years did not violate the Eighth Amendment with the proposition that Rivera-Ruperto’s sentence of, effectively, LWOP, does violate the Eighth Amendment.

. William H. Rehnquist, Luncheon Address (June 18, 1993), in U.S. Sentencing Comm'n., Proceedings of the Inaugural Symposium on Crime and Punishment in the United States, 286 (1993).

. Judge Paul Cassell, Statement on Behalf of the Judicial Conference of United States from U.S. District Judge Paul Cassell before the House Judiciary Committee Subcommittee on Crime, Terrorism, and Homeland Security, 2007 WL 3133929, Fed. Sent’g. Rep. 19(5) (2007) at *347.